

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 7, 2025

**BY ECF**
The Honorable John P. Cronan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States v. Mario Powell*, 23 Cr. 229 (JPC)

Dear Judge Cronan:

The Government respectfully submits this letter in advance of the sentencing of defendant Mario Powell, scheduled for November 14, 2025.  Following a jury trial in front of Your Honor in September 2025, the defendant was convicted of assaulting a federal officer with a deadly weapon in violation of 18 U.S.C. § 111(a) and (b)(2) and possession of prison contraband in violation of 18 U.S.C. § 1791.  The defendant's convictions stem from his vicious assault of a defenseless corrections officer with a makeshift weapon made of razor blades.  He committed the assault while awaiting trial and an eventual guilty verdict for a separate and ruthless robbery of a livery cab driver whom the defendant shot nine times.  In the Government's view, a sentence of ten years' imprisonment, which is at the top of the undisputed range of 97 to 121 months' imprisonment under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), is sufficient but not greater than necessary to serve the purposes of sentencing, in particular here the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to protect the public through removal of the defendant from society.  Finally, the Government requests that the Court impose a sentence that runs consecutively to the sentence the defendant is currently serving for the robbery and shooting to reflect the wholly distinct nature of the two offenses and deter future violence in the prison setting, both by this defendant and any other defendants who will otherwise believe that they can attack corrections officers with impunity.

## I.   Background and Procedural History

### A.  The Attack

On the morning of May 30, 2020, Officer Raheem Uddin of the Bureau of Prisons ("BOP") released the defendant from his cell at the Metropolitan Correctional Center ("MCC") for his daily recreation time.  At that time, the defendant was awaiting trial on one count of robbery, in violation of 18 U.S.C. § 1951, and one count of using, carrying and discharging a firearm during the robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  Those charges arose from a March 17, 2018 incident

during which the defendant robbed a livery cab driver at gunpoint, and then shot the driver 12 times at close range, hitting him 9 times while the victim begged for his life, desperately pleading with the defendant to spare him so that he could return to his young daughters. *See U.S. v. Powell*, 18 Cr. 287 (PAE).

As Officer Uddin testified at trial, after he let the defendant out of his cell at the MCC on May 30, 2020, the defendant ambushed him from behind, attempting to slash his neck with a homemade weapon made of razor blades, known as a "shank." (Trial Tr. 101.) The evidence at trial established that after committing the assault, the defendant ran out of the cell block and hid the shank in a recreation room, where it was later recovered by prison staff. (Trial Tr. 172.) While Officer Uddin was not killed or permanently disfigured—the defendant thankfully just missed Officer Uddin's carotid artery—he suffered a multiple inch laceration across his neck, underwent months of physical therapy, and never returned to the MCC because he was "afraid to encounter Mr. Powell." (Trial Tr. 107.)[1]

The defendant continued his unprovoked attacks on police officers in the months after the attack on Officer Uddin. On August 4, 2020, the defendant assaulted a corrections officer at the Essex County Correctional Facility ("Essex") in Newark, New Jersey. The defendant punched the officer in the face while he was attempting to escort the defendant from the recreation area to the defendant's cell. Just a few days after that, on August 6, 2020, the defendant assaulted a second corrections officer, punching him in the face without warning or provocation after asking the officer for help retrieving his shoes. The attacks did not end there. As the Presentence Investigation Report dated November 6, 2025 ("PSR") details, in April 2021, the defendant committed another unprovoked, ambush attack from behind: "Powell exited the changing room, walked behind the detention officer and stated, "Don't mess my name up next time," then struck the detention officer on his right jaw with a closed fist." (PSR ¶ 35.)

### B. The Defendant's Trial and Sentence in *United States v. Powell*, 18 Cr. 287 (PAE)

The defendant committed the attack on Officer Uddin while he was in custody awaiting trial on the charges in *United States v. Powell*, 18 Cr. 287. During that period, after a series of delays associated with the defendant's claims that he was purportedly not competent to stand trial, the defendant was definitively found competent and proceeded to trial in the robbery and shooting case, which was tried before the Honorable Paul A. Engelmayer.[2] The defendant was ultimately

---

[1]    As photographs of the laceration and the shank introduced at trial make clear, Officer Uddin was extraordinarily lucky that the flat of the razor's blade scraped across his neck rather than its edge catching and slicing into his skin, a stroke of complete fortuity. (*See* GX 106B, 107.)

[2]    Prior to that trial, the defendant's competence was evaluated on multiple occasions. In 2019, the defendant's counsel raised concerns regarding the defendant's ability to assist in his own defense, but the defendant was found competent. (18-cr-287, Dkt. No. 164, Ex. B at 6). In 2021, after the onset of the pandemic, the defendant's counsel raised more competency concerns, and an evaluating psychologist from the BOP found that the defendant was not competent. (*See* Dkt. No. 164, Ex. C at 10-13). After the defendant underwent treatment for his mental illness, which

convicted by a jury of both counts on May 18, 2023.  On May 17, 2024, Judge Engelmayer held a hearing to determine the defendant's sentence, the transcript of which is attached as Exhibit A.  As Judge Engelmayer explained, while the defendant's struggle with "mental health issues" was a "significant mitigating factor," at bottom, there was "no evidence" any mental illness was "severe enough . . . that it left [the defendant] unable to appreciate the nature and quality or wrongfulness of [his] actions." (Ex. A at 50, 54.)  All told, Judge Engelmayer concluded that an above-guidelines sentence of 288 months' imprisonment was appropriate, stating that the defendant's robbery and shooting was "one of the most horrifying, shocking, and dastardly offenses that [he had] heard about in my nearly 13 years on the bench." *Id.* at 55.  Indeed, the defendant had "shot a helpless, innocent man nine times who was begging for his life in the name of his daughters." *Id.* at 56.

In arriving at a sentence, Judge Engelmayer also confirmed that his sentencing determination did not consider the conduct charged in the present case, stating:

> For the record, I want to be as clear as I possibly can about this. I am not in any way taking into account the conduct underlying the charge in the Case 23 Cr. 229, which is pending before my colleague, Judge Cronan. I understand trial is scheduled in that case. And that case involves your allegedly slashing the neck of a correctional officer with a shank.
>
> For the record, I am assuming, for argument's sake, your innocence of that charge. Therefore, should you be convicted of that charge, there will not be available to you the argument that you have already, to any extent, been punished for the conduct underlying it.

(*Id.* at 49.)

### C.  The September 2025 Trial

Prior to the first trial of the defendant, on May 4, 2023, a grand jury sitting in this District returned an Indictment charging the Defendant with one count of assaulting a federal officer with a deadly weapon in violation of 18 U.S.C. § 111(a) and (b)(2) and possession of prison contraband in violation of 18 U.S.C. § 1791.  (Dkt. 1.)  On May 9, 2023, the parties appeared before Your Honor for an arraignment and initial pretrial conference.

After Judge Engelmayer imposed the May 2024 sentence, this case—which had been adjourned—recommenced.  Following another series of delays associated with additional claims

---

consisted of four individual counseling sessions and no prescription of any medicine, the evaluating clinical psychologist found that the defendant was again competent.  The psychologist noted that the defendant's "presentation and functioning during the present evaluation was improved from that previously documented and, despite receiving no treatment to address apparent symptoms of psychosis documented, [the defendant] has demonstrated no symptoms of mental illness." (Dkt. No. 164, Ex. D at 6).

3

by the defendant that he was purportedly incompetent to stand trial,[3] the defendant was once more definitively found competent, and proceeded to trial. Between September 22 and September 24, 2025, the Court presided over a jury trial in this case. The Government called Officer Uddin who described the details of the attack and its aftermath, identifying the defendant as his attacker. The Government also called four corrections officers who responded to the attack, some of whom participated in the search for and recovery of the shank used by the defendant in the slashing. In addition, the Government called a DNA expert, who testified that it was 74 trillion times more likely than not that the defendant's DNA was on the fabric handle of the shank (Trial Tr. at 228), and 250 trillion times more likely than not that the defendant's DNA was on the shank's razor blade. (Trial Tr. at 290)   The Government also introduced into evidence the components of the actual shank that the defendant used to attack Officer Uddin. Ultimately, the defendant was convicted by a jury of both counts on September 26, 2025.

## II.    The Applicable Guidelines Range

The Government agrees Probation's calculation of the applicable Guidelines, to which the defendant does not object.

*Counts One, Two, and Grouping.* With regard to Count One, the defendant's base offense level under U.S.S.G. § 2A2.2 is 14, because he committed aggravated assault in attacking Officer Uddin on May 30, 2020. A four-point enhancement applies under U.S.S.G. § 242.2(b)(2)(B), because the defendant used a dangerous weapon to commit the offense. An additional three-level increase applies pursuant to U.S.S.G. § 2A2.2(b)(3)(B) because the victim suffered bodily injury. And an additional two-level increase applies pursuant to U.S.S.G. § 2A2.2(b)(7), because the offense involved a violation of 18 U.S.C. § 111(b). The defendant is not entitled to a three point reduction for acceptance of responsibility because that "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 app. n.2; *see United States v. Castano*, 999 F.2d 615, 617 (2d Cir. 1993). Thus, the defendant's total offense level is 29 for Count One.

---

[3]    In October 2024, the defendant, assisted by newly appointed counsel, requested a hearing to determine whether he was "incompetent to stand trial." (Dkt. No. 29 at 2.) On November 13, 2024, after finding probable cause to believe that the defendant was suffering from mental illness that could potentially render him mentally incompetent, the Court ordered the BOP to conduct an examination of the defendant. The very next day, the defendant attempted to withdraw his competency motion, explaining that the defense's own expert after evaluating the defendant had concluded that he "is able to understand the nature of the charge against him and the consequences of the proceedings against him and to assist in his defense, and, as such, is competent to stand trial." (Dkt. No. 36 at 1.) Nonetheless, the Court found a "compelling interest" in making absolutely certain that the defendant was "competent to stand trial," and ordered that the BOP examination proceed. (Dkt. No. 40 at 9.) On February 11, 2025, the Court received a psychological report prepared by Dr. Samantha Shelton of the BOP finding again that the defendant was competent to stand trial. (Dkt. No. 12.) Based on Dr. Shelton's report, the Court found the defendant competent to stand trial on May 7, 2025.

By contrast, with regard to Count Two, because the defendant possessed contraband in prison, U.S.S.G. § 2P1.2 applies, and pursuant to § 2P1.2(a)(2), the base offense level is 13. No additional enhancements apply, and so the total offense level is 13 for Count One. Counts One and Two group pursuant to U.S.S.G. § 3D1.2(c) because Count Two embodies conduct that is treated as a specific offense characteristic in the Guideline applicable to Count One. Accordingly, pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to this group is the offense level for Count One (*i.e.*, the more serious of the two closely-related counts).

*Criminal History Category.* As discussed above, on May 17, 2024, the defendant was sentenced by Judge Engelmayer to 24 years' imprisonment for committing robbery, in violation of 18 U.S.C. § 1951(b)(1), and using a firearm during that robbery, which was discharged, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Pursuant to U.S.S.G. § 4A1.1, the defendant receives three criminal history points for this sentence, putting him in Criminal History Category II.

*Guidelines Range*. The parties also agree that the defendant's offense level of 29 and Criminal History Category of II, yields an applicable Guidelines range of 97 to 121 months' imprisonment.

## III.    Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs::

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## IV.    A Sentence At the Top of the Guidelines Range Is Appropriate.

A sentence of 10 years' imprisonment, at the top of the Guidelines range of 97 to 121 months, is sufficient but not greater than necessary, to achieve the purposes of sentencing in this case. The defendant's conduct was serious, and he refuses to accept responsibility for his actions or express any remorse. The defendant may present certain legitimate mitigating factors, but those considerations are largely outweighed by the nature of the offense, the defendant's violent history, the need to deter future criminal conduct, both his own and that of others, and, perhaps above all else, the protection of the public.

A substantial sentence is necessary to reflect the seriousness of the defendant's conduct and promote respect for the law. *See* U.S.S.G. § 3553(a)(2)(A). In attempting to slash Officer Uddin's throat with multiple razor blades wielded as a deadly weapon, the defendant could have maimed or easily killed Officer Uddin, a young man charged with protecting both the general public and the defendant himself. *See* U.S.S.G. § 2A2.2(b)(7), U.S.S.G. § 3A1.2(c)(2) (providing a two- and six-offense-level increase respectively where the offense involves a violation of 18 U.S.C. § 111(b) and included an assault on a prison official while in the custody of a correctional facility). Fortunately, Officer Uddin did not suffer permanent physical injury, but the many predictable and foreseeable ways this assault could have caused substantial physical harm if not the loss of life should weigh in the Court's determination. To find otherwise, would effectively disregard the Guidelines as well as the jury's careful determination that the offense involved both a deadly and dangerous weapon and caused bodily injury. *See* U.S.S.G. § 2A2.2(b)(2)(B), U.S.S.G. § 2A2.2(b)(3)(B) (providing a four and five-level increase respectively where the assault involved a deadly or dangerous weapon and the victim suffered serious bodily injury). Moreover, "it goes without saying that the effects of the criminal's activities on his victims is another major, and wholly legitimate, subject of the sentencing judge's consideration." *See United States v. Bradley*, 812 F.2d 774, 781 (2d Cir. 1987). As Officer Uddin testified, he was so terrified after the assault that he left his position at the BOP entirely, a role to which he never returned. A just punishment should reflect both the immediate and long-term actual and potential consequences of the assault for the victim, which in this case were severe.

A sentence at the top of the Guidelines range is also necessary to protect the public from the defendant's further crimes, particularly bearing in mind the history and characteristics of the defendant. The defendant attacked Officer Uddin unprovoked and without any apparent motive. He has a history of attacking victims, seemingly at random, including multiple other corrections officers in the year after his attack of Officer Uddin, along with the livery cab driver he shot nine times while robbing him of 23 dollars. *See* pp. 1-3, *supra.* To this day, the defendant has never taken responsibility for any of these heinous crimes or shown one iota of remorse for the harm he has done to anyone. The defendant not only proceeded to trial here but the cornerstone of his defense was accusing Officer Uddin of being "not credible" and telling a "wild story," ultimately implying that Officer Uddin may have actually fabricated the incident altogether. (Trial Tr. 302-307.) It is self-evident that members of the public would be put at risk if put in contact with someone who commits deadly but unprovoked attacks on either a whim or in a fit of anger and in either case without any sense of contrition.

The defendant in many ways seeks to turn his violent past to his advantage. Having been found guilty at trial, the defendant now asks that the Court impose no term of imprisonment, in part because he is "already serving a lengthy sentence." (Def. Mem. at 12). The fact that the defendant previously committed a heinous crime for which he received a substantial sentence does not counsel in favor of no punishments going forward. Judge Engelmayer recognized as much in sentencing the defendant for his prior trial conviction, making clear that this conduct—the vicious slashing of Officer Uddin—was *not* taken into account in arriving at that sentence. *See* p. 3, *supra*. Judge Engelmayer intentionally left open that the defendant could receive an additional sentence of incarceration were he to be convicted in the present case, which was pending at the time of his sentencing before Judge Engelmayer. The Guidelines underscore this view. Not only is a defendant's criminal history baked into the Guidelines calculation, *see* U.S.S.G. § 4A1.1, but U.S.S.G. § 5G1. § 3(b) provides for a concurrent sentence only where the prior offense is relevant conduct to the instant offense *and* was the basis for an increase in the offense level for the instant offense. Neither is true here.

Relatedly, a sentence at the top of the Guidelines range serves to afford adequate deterrence. Minimizing the present offense because of the defendant's current sentence would simply encourage unlawful conduct by those facing or serving criminal sentences, a particularly pernicious result in prison settings. The Guidelines and sentencing decisions across this district reflect "the common-sense rule that a sentence should not confer immunity for later criminal conduct." *United States v. Schorr*, No. 97 CR. 264 (MBM), 1997 WL 598444, at *2 (S.D.N.Y. Sept. 25, 1997); *see also United States v. Matera*, 489 F.3d 115, 124 (2d Cir. 2007) (affirming imposition of a 20-year consecutive sentence for an already incarcerated defendant); *United States v. Coppola*, 671 F.3d 220, 252 (2d Cir. 2012) (affirming imposition of a 16-year sentence to run consecutively to the defendant's 42-month sentence). Put differently, a defendant who acts violently and without remorse should not be given a slap on the wrist because he has a history of doing the same. That would be the opposite of deterrence. In this respect, the Government appreciates the recommendation of Probation that the defendant receive a consecutive sentence; however, because the only sentence that is relevant in this case to punishment, to specific deterrence, and to protection of the public is the sentence that is set *consecutively*, the Government respectfully disagrees with Probation that a *de facto* sentence of 60 months' imprisonment is warranted. This is neither a defendant nor a case for which a sentence of 60 months is appropriate.

7

Finally, in his sentencing submission, the defendant requests leniency in part based on his mental health struggles.  The defendant does not dispute that he was competent to stand trial—nor could he given that he has been found mentally competent no fewer than four times by four different professionals over the past six years.  *See* n. 2-3, *supra.*  But the defendant asserts nonetheless that his struggles with his mental health weigh in favor of the Court imposing no term of imprisonment at all in this case.  As Judge Engelmayer found in the defendant's prior criminal case, however, the defendant's mental health issues may well play a mitigating role to some extent, but the defendant assuredly "appreciate[s] the nature and quality or wrongfulness of [his] actions." (Ex A at 50.)  Whatever weight the Court gives to the defendant's mental health issues, they do not overwhelm the § 3553(a) factors here, and to be sure they are reflected in the Government's request for a Guidelines as opposed to an above-Guidelines sentence, which the record in this case would certainly make more than reasonable.

A within-Guidelines sentence of 120 months is thus necessary and appropriate given the circumstances of this case and this defendant.[4]  The defendant has repeatedly shown no regard for the value of human life.  Far from a victim, the defendant has perpetrated several senseless acts of violence.  Given the defendant's disregard for others, refusal to take responsibility for his crimes, and lack of remorse, a substantial sentence is warranted here.

---

[4]     A ten-year sentence is also well within the range of sentences imposed by other courts in this District for violations of §111(b).  *See, e.g.*, *Purnell v. United States*, No. 12 Cr 6 (PAE), 2015 WL 4503626, at *1 (S.D.N.Y. July 23, 2015) (9-year sentence for smashing a cane over the head of a Veterans Affairs Medical Center employee).

## V.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 120 months' imprisonment, at the top of the Guidelines range of 97 to 121 months' imprisonment, to run consecutively to the defendant's current sentence and to be followed by three years' supervised release. Such a sentence would appropriately account for the defendant's history and characteristics, reflect the seriousness of the defendant's conduct, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant.[5]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    _____
Leslie B. Arffa
Henry L. Ross
Thomas John Wright
Assistant United States Attorney
(212) 637-6522/-2442/-2295

cc:    Anthony Cecutti, Esq., Kestine Thiele, Esq. (counsel for defendant) by ECF

---

[5]    In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same).